IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Sean Baker,<br><br>        Plaintiff,<br><br>    v.<br><br>Response Team 1 Holdings, LLC,<br><br>        Defendant. | C/A No. 3:17-cv-1238-CMC<br><br>Opinion and Order Granting in Part and<br>Denying in Part Defendant's<br>Motion for Summary Judgment |

      Through this action, Sean Baker ("Plaintiff") seeks recovery for unpaid wages and wrongful discharge by his employer, Response Team 1 Holdings, LLC ("Defendant" or "RT1"). The matter is before the court on Defendant's motion for summary judgment. ECF No. 48. Defendant argues Plaintiff's claims fail as a matter of law because all compensation due was paid and Plaintiff was not discharged in violation of public policy. ECF No. 48-1. Plaintiff submits an affidavit and argues the record demonstrates an issue of fact whether he received bonuses and commissions due to him, and that he was terminated for raising these compensation issues. ECF No. 49. In reply, Defendant contends Plaintiff may not submit a post-deposition affidavit to avoid summary judgment on his claims, there is no evidence of discharge in violation of public policy, and Plaintiff has conceded his claims for treble damages under the South Carolina Payment of Wages Act ("SCPWA") and for breach of contract accompanied by a fraudulent act. ECF No. 52. Plaintiff filed a sur-reply, arguing his affidavit does not contradict his deposition testimony, and his testimony "create[s] a contract and wages recognized under the Act as well as common law contract principles." *Id.* For reasons set forth below, the motion is denied in part and granted in part.

# FACTS[1]

**Employment and Bonus Agreements.** Plaintiff became employed by RT1[2] in January 2014 as a manager for the Greenville/Spartanburg office. ECF No. 48-2 at 101. He executed the initial offer letter, dated January 8, 2014, for an agreed annual base salary of $65,000. *Id.* In addition, he was eligible to receive 2% commission per quarter for his first and second years of employment on certain projects after a 90 day probation period. This commission structure was to be "reevaluated after the two years." *Id.* Plaintiff's base pay was increased from $65,000 to $90,000 on October 6, 2014, retroactive to June 2, 2014. *Id.* at 108, 113. An unexecuted letter regarding the increase also noted he would be "eligible to receive an annual bonus of up to 20% of [his] base salary should [he] meet/exceed the key performance indicators that will be established with [the] Region Manager." *Id.* at 113. This bonus program was to become effective in the fourth quarter of 2014. The letter specifically noted "this compensation agreement will replace all previous agreement/bonus plans." *Id.*

A "Sales Incentive Program" document dated February 19, 2015, notes the Referral and Sales Commission Plan program pays 1% commission to employees "whose sales activity generates a referral resulting in a contract for services" in 2015. *Id.* at 116. The program "will supersede any previous incentive programs for 2014." *Id.* On March 30, 2015, Plaintiff's salary was increased to $110,000 when he accepted responsibility for the Columbia office as well. *Id.* at 117.

---

[1] The facts are presented in the light most favorable to Plaintiff. *See* Standard, *infra*.

[2] Plaintiff was hired by Cary Reconstruction Company, LLC, which is owned and operated by RT1.

A "General Manager Bonus Plan," signed by Plaintiff on March 26, 2015, gave general managers the opportunity to earn 20% of their base salary if the manager achieved 80% of his target and the corporate EBITDA[3] achieved at least 80% of target (necessary for any payouts to occur regardless of individual performance). *Id.* at 119-20. The bonus would be calculated as follows: EBITDA for the manager's line of responsibility, district, or office was 40% of the bonus earnings opportunity, RT1 corporate EBITDA was 30% of the bonus opportunity, "your" positive cash flow contributed 20% towards the bonus, and the final 10% of the bonus would be awarded for exceeding "your" revenue target by 10%. *Id.*

On April 2, 2016, Plaintiff's base compensation was increased to $120,000.[4] *Id.* at 131. During fiscal year 2016, although at different times, Plaintiff was responsible for the Augusta, Knoxville, Nashville, and Atlanta offices, in addition to the Greenville/Spartanburg and Columbia offices already assigned.[5] A 2016 "Leadership Compensation Plan"[6] noted Plaintiff's area EBITDA target as $1,674,381, with a total compensation target of $165,000. *Id.* at 134. A copy of this plan was executed by Plaintiff on December 12, 2016. *Id.* at 141.

---

[3] EBITDA is defined as "earnings before interest, taxes, depreciation, and amortization." *Id.* at 119.

[4] Although it is unclear from the record before the court, Plaintiff may have become a "District Manager" at this time.

[5] Plaintiff was relieved of responsibility for the Columbia office in June 2016.

[6] Shannon Kesinger, former Senior Vice President at RT1, testified at his deposition this plan was "presented to all the general managers and district managers and even myself at that time." ECF No. 49-6 at 7, Kesinger dep. at 59:10-15.

**Actual figures achieved and paid.** Plaintiff received a commission payment of $3,277.71 for 2014 performance, paid in January 2015.[7] *Id.* at 153. He also received a bonus of $11,892.19 for his 2015 performance, paid in April 2016. *Id.* According to Jeffrey Clement, RT1's former Vice President of Human Resources from May 2015 – August 2017, Plaintiff's 2015 bonus was paid as he met his EBITDA target for his area of responsibility and exceeded his target revenue for fiscal year 2015. ECF No. 48-3 ¶¶ 26, 27; ECF No. 48-3 at 38. However, according to the Operations Management Bonus spreadsheet, corporate EBITDA target and positive cash flow[8] were not met for 2015, so Plaintiff's full bonus under the General Manager Bonus Plan was not paid. ECF No. 48-3 ¶ 27; ECF No. 48-3 at 38. For 2016, according to Clement, who calculated area EBITDA "taking partial year EBITDA target results into consideration," Plaintiff's area of responsibility EBITDA target of $1,674,381 was not met and therefore Plaintiff did not qualify for a bonus. ECF No. 48-3 ¶ 29.

**Payment Inquiries and Restructuring.** In October 2016, Plaintiff inquired about commissions and bonus he believed were due to him, requesting documentation regarding the calculations of these numbers. ECF No. 48-2 at 140. He spoke on the phone to Ms. Smith around that time and received a 2016 compensation plan a few weeks later. ECF No. 48-1 ¶ 14. On February 1, 2017, Clement formally responded to Plaintiff's requests, noted he would provide the pay breakdown for 2015 and 2016 and that he believed "the documents you signed in 2015 supersede the offer letters dated in 2014, and thus you have been compensated appropriately for

---

[7] Plaintiff does not believe he is currently owed any earned compensation for 2014. ECF No. 49-4 at 17, Pl. dep. at 46:11-16.

[8] Clement notes "cash flow" is represented as "DSO" on the spreadsheet at ECF No. 48-3 at 37-38.

2015 and 2016," but wanted to review the information with Plaintiff to "ensure you have been compensated in accordance with the agreed upon terms as outlined in various compensation documents." ECF No. 48-3 at 42. By email follow-up two days later, Clement provided the compensation received in 2014-2016, stated the commission paid in January 2015 was for 2014 performance, and the April 2016 bonus paid was for 2015 performance. *Id.* at 44.

Separately, on February 17, 2017, Shannon Kesinger (Senior Vice President, Southeast Region, and Plaintiff's supervisor at the time) sent an email to Ross Poole (Senior Vice President, Acquisition Specialist/Chief Talent Officer) and Julie Smith (Regional Human Resources Director) titled "Restructuring Rough Draft" "confirming [a] telephone discussion of Wednesday February 15, 2017, and serving as his "recommendation for the stated need to conduct a thorough review of overall expenses, management, and oversight of [his] region." ECF No. 48-2 at 144. Specifically, in order to address the "overall finances of the business [that] may not allow for additional layers of administrative management and oversight for individuals that do not have direct management of an individual branch," he proposed to eliminate Plaintiff's position to "minimize the number of branches in which a senior GM or district manager would oversee and limit it to no more than 2 branches." *Id.* Kesinger proposed eliminating the position "of my only Dedicated District Manager, (Sean Baker) which would represent a cost savings of his annual salary of $120,000 . . ." and increase the responsibilities of the three general managers to oversee the offices for which Plaintiff held responsibility. *Id.* He further noted this "restructuring would not only allow for continuous and necessary oversight of existing branches, but also would promote leadership development within the current leadership team, allow for the right sizing of some existing low salaries commensurate with their role and responsibilities in advance of the new comp plan that is predicated on base salaries." *Id.* This was approved with some changes to others'

5

salaries. *Id.* at 148-150. On March 7, 2017, Plaintiff was sent a letter eliminating his current position and terminating his employment as of that day. *Id.* at 152.

## STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## DISCUSSION

Plaintiff claims he was not paid commissions for 2015 revenues nor a portion of the 2015 bonus earned. He contends his 2016 bonus should have been calculated using the offices for which he held responsibility at the time he signed the 2016 compensation plan, which were Greenville, Augusta, Knoxville, and Atlanta. Therefore, he argues, Defendant has breached four written commission and bonus plans with Plaintiff throughout his employment and violated the SCPWA. In addition, Plaintiff asserts claims for wrongful discharge in violation of public policy and breach of contract accompanied by a fraudulent act related to his termination.

   1. **Admissibility of Plaintiff's Affidavit**

As an initial matter, Defendant contends Plaintiff's affidavit, submitted with his response to the summary judgment motion, conflicts with his deposition testimony and therefore cannot be

6

used to show a genuine issue of material fact exists. ECF No. 52 at 2. It also argues Plaintiff's affidavit contains inadmissible hearsay or opinion evidence, and documents incorporated within the affidavit are unauthenticated and cannot be admitted. Plaintiff argues his deposition does not contradict the affidavit, and notes "many of the relevant documents were provided to Plaintiff by Defendant through supplemental discovery responses after the deposition and many after the summary judgment motion itself." ECF No. 53 at 2. Plaintiff contends Defendant "conflates two or more different issues in its table of affidavit testimony to deposition testimony." *Id.*

Plaintiff may not submit a self-serving affidavit that conflicts with his deposition testimony in order to create a genuine issue of material fact and defeat summary judgment. *Barwick v. Celotex Corp.*, 736 F.2d 946, 96 (4th Cir. 1984); *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411 (4th Cir. 2014). Therefore, the court must compare Plaintiff's deposition testimony to the affidavit on the pertinent issues to determine whether the affidavit contradicts his deposition testimony or is merely supplementary. If the court relies on Plaintiff's affidavit during its analysis on any of the issues below, it will examine the deposition transcript to determine whether the affidavit on that point contradicts the deposition.

### 2. First Cause of Action: Breach of Contract/Violation of SCPWA

*a. General Compensation Plan signed in 2014*

While Plaintiff does not assert any 2014 commissions are owed to him under the Compensation Plan he signed when he became an employee of Defendant, he argues commissions of 2% on non-program revenue are due to him for 2015 and 2016 pursuant to this plan. ECF No. 49. Plaintiff claims he is due $56,950.21 for 2015, and a "significant commission payment" for 2016 before the two year period of the Plan expired in April 2016. *Id.* at 10. Defendant claims Plaintiff "failed to present any record evidence that distinguishes between revenue and 'completed

7

non-program projects that cumulatively met the required profit margins.'" ECF No. 48-1 at 14. Defendant also argues Plaintiff does not know what the term "other results which will be determined" means and therefore cannot definitively say he is due commissions. Finally, Defendant contends Plaintiff is not due commissions under this plan for 2015 and 2016 because the plan was superseded by an offer letter in October 2014 increasing his salary and making him eligible for an annual bonus of up to 20% of his base salary. *Id.* at 15.[9]

In response to Defendant's arguments, Plaintiff claims he never received the letter attached to an email in October 2014 that allegedly notified Plaintiff he would be on a new bonus plan which supplanted other plans. ECF No. 49 at 11. Plaintiff argues the "alleged replacement plan never went into effect and variables indicated in the document were not determined at any time." *Id.* He believes the letter was "likely not sent and certainly was never received by Baker." *Id.* Therefore, Plaintiff argues, there is a genuine issue of material fact regarding the payment of commissions under the Compensation Plan.

The court finds the General Compensation Plan to be unambiguous on its face in binding Defendant to pay non-program commissions to Plaintiff for two years after April 2014 (following the 90 day probationary period after the execution date). *See World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1995). However, the question is whether another agreement superseded the General Compensation Plan or Plaintiff is due commissions under the Plan for 2015 and/or a limited period in 2016.

While Defendant argues the October 2014 letter superseded the General Compensation Plan, and it indeed purports to do so, it is unsigned by Plaintiff. ECF No. 48-2 at 113. Further,

---

[9] Defendant makes the same points in its reply. *See* ECF No. 52 at 9.

Plaintiff disputes ever receiving this document. ECF No. 49-5 at 10-11, Plaintiff dep. at 101:3-103:19. He agrees his base pay was increased from $65,000 to $90,000 in October 2014, retroactive to June 2014, but does not believe he received the letter changing the terms of his compensation beyond base pay. Although Defendant argues Plaintiff's continuing to work after he received the salary increase constitutes acceptance of the terms of the increase, there is an issue of fact as to whether Plaintiff was aware the change in bonus structure was a part of the compensation increase. Therefore, the court is unable to hold as a matter of law the October 2014 letter rendered the 2014 General Compensation Plan inoperable.

If the General Compensation Plan was still in effect in 2015, Plaintiff asserts in his affidavit he is due commissions of $56,950.21 for 2015. ECF No. 49-1 at 6, Plaintiff aff. ¶ 24. As Defendant noted, Plaintiff did testify in his deposition he could not calculate how much he was owed in each year; however, he also testified this was due to the lack of documentation provided to him, despite multiple requests, in discovery. ECF No. 48-2 at 13, Plaintiff dep. at 46:17-20; 47:14-22. Therefore, the court finds Plaintiff's affidavit did not contradict, but rather supplemented, his deposition testimony due to availability of further documents after the deposition took place. Although Defendant argues Plaintiff has not presented record evidence distinguishing between revenue and "completed non-program projects," Plaintiff noted in his affidavit he utilized Defendant's software program that categorized program vs. non-program work during his employment and calculated his offices' non-program revenue. ECF No. 49 at ¶¶ 23-24. Taken in the light most favorable to the Plaintiff, there is a genuine issue of material fact regarding the amount due to him under the General Compensation Plan for 2015 commissions.

### b. *Sales Incentive Program of February 2015*

The Sales Incentive Program, signed by Plaintiff on February 19, 2015, provided for a 1% commission for any employee whose sales activity generated a referral resulting in a contract for services. ECF No. 48-2 at 116. The Program explicitly stated it superseded "any previous incentive programs for 2014." *Id.* Defendant believes Plaintiff does not appear to allege any wages, bonuses, or commissions are due to him under this plan. ECF No. 48-1 at 16.

Plaintiff argues this plan did not affect his prior compensation plan, so his non-program commissions due under the General Compensation Plan should not be affected by the signing of this "incentive program." ECF No. 49 at 12. Plaintiff presents deposition testimony from Kesinger noting this Program would not have negated compensation plans, but was "an addition to their current structure." ECF No. 49-6 at 13, Kesinger dep. at 112:2-15. He also argues his supervisor at the time, Ken Sussex, stated to Plaintiff "this incentive program did not affect an employee's compensation plan." ECF No. 49 at 12; ECF No. 49-1 ¶ 8. Plaintiff therefore argues an issue of fact remains as to whether this Sales Incentive Program was intended to supersede an already in effect compensation plan. ECF No. 49 at 13. In reply, Defendant argues Plaintiff's affidavit should be disallowed and statements regarding Sussex are inadmissible as hearsay and are "wholly unsupported by any record evidence." ECF No. 52 at 10. Plaintiff responds his supervisors' statements are admissions by a party-opponent and therefore are not hearsay. ECF No. 53 at 3.

The court finds Plaintiff has raised a genuine issue of material fact regarding whether the Sales Incentive Program of February 2015 replaced and superseded his initial General

Compensation Plan.[10] In support of his view the Sales Incentive Program was in addition to his General Compensation Plan, Plaintiff presented deposition testimony from his former Regional Senior Vice President, Kesinger, who noted the Incentive Program was "additive" to the employee's Compensation Plans. *See* ECF No. 49-6 at 12, Kesinger dep. at 112:2-13 ("My recollection of this sales incentive program was that it . . . was given to everybody in the company to promote a sales culture in the company. So with that said, there was all sorts of different people performing all sorts of duties on all sorts of different comp plans that were not negated by this addition to their current structure."). Although the Sales Incentive Program noted it "will supersede any previous incentive programs for 2014," there is evidence (excluding Plaintiff's affidavit) this new Program simply meant to supersede any previous *sales* incentive program, not any program or plan that contained any incentive. *Id.* at 109:21-110:12 (Q: "I'm asking for how you read the plain language of the sentence above his signature on Exhibit 5. 'This will supersede any previous incentive programs for 2014.'" A: "I would read this to say that this negates any previous sales incentive programs that may have been created."). Kesinger does admit it would be clearer if the document noted "this will supersede any previous sales incentive program for 2014," but the court finds the wording sufficiently ambiguous in light of the various plans in existence to preclude summary judgment.

Aside from the issue whether the 1% Sales Incentive Program superseded the 2% commission in Plaintiff's General Compensation Plan, Defendant noted in its summary judgment motion Plaintiff "does not allege that any wages, bonuses or commissions are due to him under

---

[10] The court makes this determination based on deposition testimony of Kesinger, and did not rely on Plaintiff's affidavit. Therefore, the court declines to determine whether Plaintiff's affidavit is admissible on this issue or whether Sussex's opinion is hearsay.

this plan." ECF No. 48-1 at 16. However, Plaintiff claims the 1% Sales Incentive plan remained active into 2016, and therefore he is owed an approximately $500 bonus under this plan for a direct referral resulting in a contract in May 2016. ECF No. 53 at 15. He provides documentation in the form of emails produced in discovery showing he was the "lead generator" for one "GSP job" associated with $50,294.21 in revenue. ECF No. 49-13. Defendant does not address this issue in its reply. Therefore, it remains unresolved by this motion.

*c. General Manager Bonus Plan of March 2015*

Plaintiff claims he was paid a partial bonus for his work in 2015 under this plan, but "was not paid for his offices' cash flow or for meeting target Corporate EDITDA." ECF No. 49 at 17. Defendant argues no 2015 bonus was due to Plaintiff because the Corporate EBITDA figure was -$2,391,924. ECF No. 48-1 at 17. Because the Bonus plan stated the corporate EBITDA "must achieve 80% of the target for any payout to occur regardless of individual performance," Defendant contends no bonus was due to Plaintiff; nevertheless, Defendant paid Plaintiff a bonus of $11,892.19 for 2015 work. *Id.* Therefore, Defendant argues no wages, bonus, or commissions are due to Plaintiff under this plan or otherwise.[11] *Id.* Plaintiff asserts his offices were cash flow positive, and therefore he should have received $4,400 in additional bonus monies. ECF No. 49 at 17. Plaintiff argues no target EBITDA number has been produced, and no supporting documentation is provided for the actual EBITDA number provided by Defendant. *Id.* at 18. Therefore, Plaintiff argues, there are issues of material fact as to cash flow for his offices and the corporate EBITDA number for 2015.

---

[11] Defendant does not appear to argue this Bonus Plan superseded the 2014 General Compensation Plan, in either its Memorandum in Support of Summary Judgment or its Reply. *See* ECF Nos. 48-1, 52.

Defendant's reply notes "Plaintiff admits he is unable to quantify what he believes he is due under the General Manager Bonus Plan." ECF No. 52 at 10. Defendant also argues Plaintiff cannot "seek to create a genuine despite of fact by offering conflicting versions of his own testimony," noting Plaintiff averred in his Memorandum in Opposition he would and did have the information necessary to determine if his office was cash flow positive, but his affidavit stated he was "never given any information on cash flow or corporate EBITDA – as to why it was not earned."[12] *Id.* at 11.

The General Manager Bonus Plan makes it clear no bonus is due if the corporate EBITDA does not exceed 80% of the target. ECF No. 48-2 at 119. Defendant has produced documentation showing the audited corporate EBITDA for 2015 was -$2,391,924. ECF No. 48-3 at 34. Although Defendant has not produced any information regarding the "target" corporate EBITDA for 2015, it argues it is "inconceivable" the target was a negative number. ECF No. 48-1 at 17. Therefore, it submits, no bonus was due to Plaintiff for 2015 under this plan.

The court finds there remains an issue of fact as to whether Plaintiff is due an additional bonus under this plan. Plaintiff has testified his offices in 2015 had positive cash flow. ECF No. 49-5 at 3, Plaintiff dep. at 70:24-25. In addition, Defendant has failed to produce the target Corporate EBITDA number and any underlying or supporting documentation for the 2015 Corporate EBITDA. Plaintiff did receive a bonus of $11,892.19, which Defendant asserts would

---

[12] The court finds this argument disingenuous. The company only recently produced the corporate EBITDA on April 30, 2018, and to the court's knowledge has not produced verifiable documentation regarding it or cash flow. While Plaintiff may have had the information he needed to calculate cash flow, he also may not have had information on why Defendant did not pay out the bonus for cash flow. The court does not find these statements contradictory when viewed in context.

13

not have been payable if the Corporate EBITDA had not been met. For these reasons, summary judgment is not appropriate for this claim.

### d. *Leadership Compensation Plan of 2016*

The final plan, for 2016, used the area EBITDA numbers for each office to determine bonus eligibility and amount. ECF No. 48-2 at 141. Plaintiff was responsible for the Greenville/Spartanburg and Augusta locations for all of 2016, the Columbia office until June 2016, the Knoxville office beginning in July 2016, and the Nashville and Atlanta offices beginning in September 2016. ECF No. 48-1 at 18; ECF No. 48-3 at ¶ 28. According to Defendant via Clement's declaration, Plaintiff did not meet his area EBITDA target of $1,674,381 and therefore did not qualify for a bonus in excess of his base salary for 2016. ECF No. 48-1 at 19; ECF No. 48-3 at ¶ 29.

Plaintiff asserts his area EBITDA exceeded target by about 5%, and he calculates his bonus due as $48,727. ECF No. 49 at 21; ECF No. 49-1 at ¶ 28. He also argues the area EBITDA could be incorrect because he "and other managers, in 2016, consistently found costs erroneously attributed by corporate to their offices." ECF No. 49 at 11. Plaintiff contends he was told by his supervisor at the time he signed the Plan "only current offices were associated with the bonus and target;" however, Defendant's approach, as outlined in Clement's declaration, prorated yearly figures based on the duration at each location. *Id.* at 23. He also claims the EBITDA number for his area is simply incorrect as calculated by Clement, who provided no documentation showing the calculation. *Id.* at 24-25. Therefore, he claims, an issue of fact remains as to the calculation of his bonus under this Plan. Defendant disagrees, arguing Plaintiff provided no evidence to refute Defendant's position Plaintiff did not exceed his EBITDA target, as his affidavit "directly

contradict[s]" Plaintiff's deposition testimony stating he "cannot state what amount he believes is due." ECF No. 52 at 12.

The Leadership Compensation Plan of 2016 does not explicitly state how an "area" EBITDA is to be calculated and whether it includes all offices managed at any point in the year or only those managed at the end of the year. ECF No. 48-2 at 141 (noting only "EBITDA target may be adjusted based on responsibility changes and acquisitions within your span of responsibility."). Therefore, it is appropriate to consider evidence outside the four corners of the document in order to determine its meaning. The court finds Plaintiff's affidavit on this point to be supplementary, not contradictory, to his deposition testimony. *Compare* Plaintiff dep. at 47:14-22 (stating he is unable to calculate how much the *total amount* is he is owed by Defendant at that time) (emphasis added) *with* Plaintiff aff. ¶¶ 28-29 (calculating his area EBITDA and disagreeing with Clement's declaration as to that point). Taken in the light most favorable to Plaintiff, the court finds a genuine issue of material fact as to the method of calculation of Plaintiff's area EBITDA and the amount due, if any. The court is unable to say as a matter of law Plaintiff is not owed any bonus under this plan; therefore, summary judgment is denied on this point.

*e. Paid Time Off ("PTO") payment upon termination*

Plaintiff contends he is due unpaid vacation compensation in the amount of $4,480. ECF No. 49 at 26. Although Defendant cites deposition and affidavit testimony regarding PTO, this was only in the context of comparing the two; Defendant offers no argument as to whether PTO is owed or evidence showing why it is not. ECF No. 52 at 4, 6. Therefore, summary judgment is not appropriate on this claim.

### f. Conclusion as to Summary Judgment on Breach of Contract/SCPWA

As Plaintiff has raised genuine issues of material fact as to bonuses and commissions due under each of the agreements, summary judgment is inappropriate on Plaintiff's claim of breach of contract and violation of the SCPWA. Defendant's motion for summary judgment as to Plaintiff's first cause of action is denied.

### g. Treble Damages and Attorney's Fees under SCPWA

In his Complaint, Plaintiff requested an award of treble damages and attorney's fees for the alleged violations of the SCPWA. Defendant argues Plaintiff has failed to address this issue in response to its summary judgment motion and therefore, Plaintiff has abandoned his claim for treble damages and attorney's fees.[13] ECF No. 52 at 13. Despite this argument, Plaintiff again failed to discuss this issue in his sur-reply. Under Rule 56, the court may "consider the fact undisputed for purposes of the motion," and/or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

The SCPWA states "[i]n case of any failure to pay wages due to an employee as required by Section 41-10-40 or 41-10-50 the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow." S.C. Code § 41-10-80(c). However, the South Carolina Supreme Court has held this language to be discretionary and not mandatory, and the imposition of treble damages "in

---

[13] The cases cited by Defendant do not discuss failure to include an argument at summary judgment, but rather on appeal. *See* ECF No. 52 at 13 (citing, e.g., *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (holding a party's failure to raise or discuss an issue in its brief *to the appeals court* is deemed abandonment of the issue)).

those cases where there is a bona fide dispute would be unjust and harsh." *Temple v. Tec-Fab, Inc.*, 675 S.E.2d 414, 415-16 (S.C. 2009) (citing *Rice v. Multimedia, Inc.*, 456 S.E.2d 381, 383 (S.C. 1995)). Neither treble damages nor attorney's fees should be awarded in the case of a bona fide dispute as to the wages owed. *See Futch v. McAllister Towing of Georgetown, Inc.,* 518 S.E.2d 591, 598 (S.C. 1999) (declining to reinstate award of treble damages and attorney's fees "because there was a bona fide dispute about whether Employer owed [Employee] any wages."); *Goodwyn v. Shadowstone Media, Inc.*, 757 S.E.2d 560, 563 (S.C. Ct. App. 2014) ("[T]he trial court must determine whether a bona fide dispute exists as to an employee's entitlement to wages before awarding treble damages or attorney's fees."). "A finding that an employee is entitled to recover unpaid wages is not equivalent to a finding that there existed no bona fide dispute as to the entitlement to those wages." *Temple*, 675 S.E.2d at 415-16.

Defendant argues Plaintiff has failed to produce any evidence Defendant "willfully and intentionally failed to pay any wages, bonuses, or commissions allegedly due to him." ECF No. 48-1 at 21. Therefore, Defendant contends, it is entitled to summary judgment as to payment of treble damages and attorney's fees. *Id.* Plaintiff presents no argument in response.

The court agrees Defendant has presented a bona fide dispute as to whether bonuses or commissions are due to Plaintiff under the various plans. As Plaintiff has presented no further evidence justifying treble damages or attorney's fees, and Defendant appears to have presented at least a bona fide dispute as to the payment of bonuses or commissions, the court grants summary judgment for Defendant as to the issue of treble damages and attorney's fees under the SCPWA.

### 3. **Second Cause of Action: Wrongful Discharge in Violation of Public Policy**

Defendant contends Plaintiff's claim for wrongful discharge in violation of public policy fails as a matter of law because Plaintiff failed to establish his termination violated public policy

and failed to sufficiently state a source of the clear mandate of public policy. ECF No. 48-1 at 23-24. Plaintiff argues the record contains substantial evidence management and human resources were "irritated and even hostile" regarding the requests for information and past due wages." ECF No. 49 at 28. Plaintiff contends the plan was made to restructure the company, and eliminate Plaintiff's position, very quickly following his attorney's letter regarding unpaid bonuses and commissions, which specifically mentioned the SCPWA. *Id.* He notes he was "an excellent and highly productive employee" during his employment. Therefore, he argues a reasonable jury could conclude he was terminated in retaliation for his inquiries as to bonuses. *Id.* at 29. In reply, Defendant argues there is no record evidence Plaintiff was terminated in retaliation for filing a claim under the SCPWA or threatening to do so. ECF No. 52 at 13.

In South Carolina, "an at-will employee has a cause of action for wrongful termination where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy," and "what constitutes public policy is a question of law for the courts to decide." *Barron v. Labor Finders of South Carolina*, 713 S.E.2d 634, 638 (S.C. 2011). Although a public policy claim can only be maintained in the absence of a statutory remedy, the South Carolina Supreme Court has held the SCPWA does not "provide a statutory remedy whereby an employee may recover damages for wrongful termination," and so "an action for wrongful termination cannot be precluded under the holdings outlined in *Dockins* [*v. Ingles Markets, Inc.*, 413 S.E.2d 18 (S.C. 1992)] and *Epps* [*v. Clarendon County*, 405 S.E.2d 386 (S.C. 1991)]." *Id.* However, the *Barron* court declined to address whether a public policy exception applies when an employee is terminated for instituting proceedings under the SCPWA, because it found the plaintiff in that case had not implicated the Act: she neither filed a complaint with the Department of Labor nor indicated to her employer she had filed or intended to file a complaint. *Id.* After *Barron*, however,

18

the South Caroline Court of Appeals has noted "a violation of the Payment of Wages Act is a violation of a clear mandate of public policy." *McNeil v. South Carolina Dept. of Corr.*, 743 S.E.2d 843, 847 (S.C. Ct. App. 2013).

In this case, unlike *Barron*, Plaintiff inquired about his allegedly due commissions and bonuses and retained counsel, who informed Defendant they were willing to pursue the "past due compensation . . . through judicial process if necessary. . . ." ECF No. 49-12 at 3. While Plaintiff had not yet filed suit at the time of his termination, it is clear Defendant was on notice of the possibility of a lawsuit regarding allegedly unpaid amounts. *See, e.g.*, ECF No. 49-13 (emails between Clement and Bill Budig, requesting information regarding commissions for 2015 and 2016, in which Clement noted "trying to prevent a lawsuit"). Defendant then, not three weeks after the letter from Plaintiff's attorney, discussed "restructuring" and eliminating Plaintiff's position. The timing, and the fact that only Plaintiff's position was eliminated, raise a genuine issue of material fact precluding summary judgment as to whether he was terminated as a result of threatening legal process to recover allegedly unpaid bonuses and commissions. Summary judgment on this claim is denied.

### 4. Third Cause of Action: Breach of Contract Accompanied by a Fraudulent Act

Defendant argues Plaintiff has also failed to respond to this issue raised in its summary judgment motion and therefore, Plaintiff has abandoned this argument and summary judgment is appropriate. ECF No. 52 at 13. Despite this argument, Plaintiff again failed to discuss this issue in his sur-reply.

Breach of contract accompanied by a fraudulent act has three elements Plaintiff must establish: 1) a breach of contract; 2) fraudulent intent relating to the breach and not to the making of the contract, and 3) a fraudulent act accompanying the breach. *Conner v. City of Forest Acres*,

19

560 S.E.2d 606, 612 (S.C. 2002). "The fraudulent act is any act characterized by dishonesty in fact or unfair dealing." *Id.* Plaintiff has failed to produce evidence regarding any fraudulent actions or intent by Defendant, acknowledging at his deposition he was unaware of any. *See* ECF No. 48-2 at 21, Plaintiff dep. at 79:15-80:8. As Plaintiff has presented no evidence raising a genuine issue of material fact, summary judgment on this claim is proper and it is dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is denied in part and granted in part. Summary judgment is denied as to Plaintiff's first cause of action for breach of contract/violation of the SCPWA and second cause of action for wrongful discharge in violation of public policy. Summary judgment is granted to Defendant on the issue of treble damages and attorney's fees under the SCPWA and on the third cause of action for breach of contract accompanied by a fraudulent act.

**IT IS SO ORDERED**.

s/Cameron McGowan Currie<br>CAMERON MCGOWAN CURRIE<br>Senior United States District Judge

Columbia, South Carolina
September 6, 2018